IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

| | |
|---|---|
| **MEDCOR, INC.**, <br><br> Plaintiff, <br><br> v. <br><br> **CHRISTOPHER GARCIA; AMANDA BROWN; DR. RAVI PATEL; KATHERINE THOMAS;** and **MEDWAY HEALTH, INC.**, <br><br> Defendants. | Civil Case No.: 1:21-cv-02164 <br><br> Hon. Manish S. Shah |
| **CHRISTOPHER GARCIA**; and **MEDWAY HEALTH, INC.**, <br><br> Counterclaim-Plaintiffs, <br><br> v. <br><br> **MEDCOR, INC.**, <br><br> Counterclaim-Defendant. | **MEDCOR, INC.'S MEMORANDUM IN SUPPORT OF A PRELIMINARY INJUNCTION** |

**MEDCOR, INC.'S MEMORANDUM IN SUPPORT OF A PRELIMINARY INJUNCTION**

This Memorandum is filed in support of Medcor, Inc.'s ("Medcor") Motion for a Preliminary Injunction against Christopher Garcia ("Garcia"), Amanda Brown ("Brown"), Dr. Ravi Patel ("Patel"), and MedWay Health, Inc. ("MedWay") (collectively, "Defendants").[1]

Medcor's decades-long relationships with parent companies in the entertainment and sports

---

[1] By agreement of the parties, and pursuant to the Court's Order of October 7, 2021 (Dkt. 65), the parties suspended the preliminary injunction hearing commenced on September 14, 2021, and are presenting written submissions to the Court in lieu thereof. These written submissions follow, and are further informed by, subsequent depositions and document productions occurring in early October 2021. Patel's deposition transcript (Ex. A) and Garcia's deposition transcript (Ex. B) are unsigned as of the date of this filing, and Brown has waived signature for her deposition transcript (Ex. C). The deposition transcripts remain presumptively confidential at present in accordance with the terms of the Protective Order. Exhibit D contains transcript excerpts from the September 14, 2021 Preliminary Injunction ("PI") Hearing.

industries like ViacomCBS Inc. ("Viacom"), Warner Brothers Entertainment Inc. ("Warner Bros."), and key decision-makers at those companies and their affiliates, have been critical to its success. PI Hearing Tr. 24-29. Indeed, it was through Medcor's long-standing relationships with these companies that Medcor began providing COVID-19 health security screening, testing and worksite COVID-19 exposure management services ("COVID Services") to Viacom and Warner Bros. subsidiaries like CBS Sports and Shed Media, respectively, among others. *Id.* Key client contacts, and their respective decision-making authority, cannot be identified or accessed through an Internet search. Rather, relationships with these individuals are developed over time and with considerable investment. Dkt. 13, Ex. A at ¶ 9. Indeed, how could someone like Garcia, a former car salesman and banker with no prior experience in production medicine, and without the benefit of Medcor's Rolodex of contacts, know how to acquire customers or provide COVID Services operating out of his home and a UPS post office box? *See* Garcia Dep. at 18:7-19:4.

Medcor gave Garcia, Patel, and Brown ███████████████████████████████████████████████████████████████████████████ PI Hearing Tr. 109:19-23. Defendants were not satisfied, however, with their well-compensated positions at Medcor, and sought to convert their access to Medcor's customers, as well as Medcor's trade secrets and confidential information, to their own individual benefit, all to Medcor's detriment. *See* Dkt. 13, Ex. A at ¶ 21.

One day after his December 9, 2020 termination for cause by Medcor (*see, e.g.*, PX 252–253), Garcia accessed his unreturned Medcor laptop and took approximately 200 photographic images with his cell phone of Medcor confidential and proprietary proposals, contracts, and other business sensitive trade secret information. Garcia Dep. at 89:22-121:6; PX 129–PX 138. Garcia surreptitiously photographed these materials page by page, rather than downloading or printing the documents from his laptop, to avoid detection by Medcor. Garcia Dep. at 101:21-25. Garcia stole

confidential contracts and proposals with Medcor's biggest COVID Services clients, including CBS Sports, Shed Media, and Disney-ESPN.² Garcia Dep. at 89:22-121:6; PX 129–PX 138.

███████████████████████████████████████████████████████

███████████████ Garcia Dep. at 120:24-121:6.³

The materials that Garcia misappropriated constitute a blueprint for creating a competing business. Medcor designates such information as confidential for a reason—Medcor has invested millions in developing the business, operational, marketing and pricing strategies for COVID Services that are spelled out in the documents. PI Hearing Tr. 84:6-85:22. In essence, these materials are the lifeblood of Medcor's COVID Services operation. Garcia knew this, and as someone with no prior experience in the industry, he knew that he could not start a competing business without taking Medcor's proprietary information (and clients) with him on his way out.

Since at least late 2020 and for many months thereafter, Garcia conspired with Medcor's former Operations Manager (and his paramour) Amanda Brown (see PX 235 at MEDCOR000334-344; PX 214), and with Medcor's former ordering physician Dr. Ravi Patel (see PX 167 at GAR02471; PX 208), and with others inside Medcor and at Medcor's customers, in Svengali fashion, to undermine Medcor and steal Medcor's clients, including two of Medcor's largest clients at the time, CBS Sports and Shed Media, with the intent to poison the well and cause their

---

² Garcia stole the following documents from Medcor: 

³ ███████ Garcia Dep. at 116:7-117:5.

3

defections to MedWay. PX 235 at MEDCOR000341. At the same time, Garcia was publicly passing off the knowledge and experience of Medcor in providing COVID Services as attributable to himself and MedWay. Dkt. 15; PX 6. ██████████████████████████ Garcia Dep. at 225:22-226:24.

Unfortunately, in certain instances, Defendants' bold gambit succeeded. In the months following Garcia's termination, Defendants successfully disrupted Medcor's contractual relationship with CBS Sports, a loss to Medcor of business worth millions of dollars. PI Hearing Tr. 118:11-120:3. ████████████████████████████████████████████████████ Garcia Dep. at 168:24-169:7. All Defendants played roles in the disruption of the CBS Sports relationship. ████████████████████████████

████████████████████████████████████████████████████████████████████████

████████████████████████████████████████████████ Garcia Dep. at 34:9-35:9. Brown also used her position as Medcor's Operations Director in charge of the CBS Sports relationship to exercise her "leverage right now to fuck shit up for Medcor and CBS relationship" (PX 235 at MEDCOR0000336), including by explicitly directing Mr. North to not sign any Medcor agreements for COVID Services or forward them to CBS Legal for review. *Id.* at MEDCOR0000327. When Medcor executives like Dr. Brian Wilbur suspected Defendants' subterfuge, Defendants worked together to prepare correspondence to Dr. Wilbur concealing the truth and the nature of their extensive courting of Mr. North. *See* PX 205–PX 209; PX 254; PX 167 at GAR02435-GAR02439.

Defendants also successfully diverted and coopted another one of Medcor's largest COVID Services clients, Shed Media, the production company behind the popular *Real Housewives*

television series. Garcia himself admits that MedWay obtained Shed Media as a customer solely because of Defendants' interference, plainly acknowledging to Brown: "[L]et's be very clear about some things, first I have Shed Media because of you. There is no other reason. I owe it completely to you." PX 235 at MEDCOR0000336. Patel enthusiastically congratulated Garcia for "sniping" the Shed Media business from Medcor (PX 167 at GARCIA00135) and his Medcor colleagues, ███████████████████████████████████████████████ Patel Dep. at 174:12-175:15 and 129:20-130:20. Defendants actively recruited Medcor employees who provided COVID Services to the *Real Housewives* production on behalf of Medcor, to provide the same services to the same production on behalf of MedWay. *See* Garcia Dep. at 180:15-193:23. At least some of these Medcor employees, working on MedWay Projects had non-compete agreements with Medcor. *See* Garcia Dep. at 194:7-200:2. Not only were Defendants aware of the breaches to these Medcor employees' non-compete agreements that would result in their work for MedWay, Defendants encouraged such breaches and discussed potential "loopholes" to the agreements. *See, e.g.*, PX 167 at GAR02675. Garcia likewise encouraged Medcor employees like Kathryn Thomas to deceive Medcor as to her whereabouts when conducting *Real Housewives* production work for MedWay, going so far as to instruct Thomas to turn off her Medcor computer to avoid detection. PX 170 at GAR02713.

███████████████████████████████████████████████████████████████████████████████████████████████████.[4] Garcia Dep. at 140:7-141:3. This is not surprising, as Defendants are entirely dependent on their access to Medcor's customers, trade secrets, confidential information, and employees in order to keep the

---

[4] In recent discovery responses served on Medcor, MedWay has concealed the extent of its theft of Shed Media business by refusing to provide financial discovery on the pretense that it is not relevant to this preliminary injunction proceeding. This is all the more evidence of Medcor's incalculable and irreparable harm.

MedWay business afloat. PX 235 at MEDCOR0000322 ("I need something bigger than Shed and Packagers, otherwise I'm going to be working for free here").

The Defendants now try to brush off the devastating consequences to Medcor of their wrongful actions. ▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓ (Brown Dep. at 199:15-24; Patel Dep. at 129:10-22; Garcia Dep. at 234:6-21) and they advance arguments that (1) CBS Sports was unhappy with Medcor and may not have engaged Medcor for future COVID Services work; and (2) Medcor lost the Shed Media work because its pricing proposal was too high. The Defendants' defenses are so tenuous as to beggar belief, and fall apart when one considers their own private communications and actions behind the scenes to poison the relationships Medcor had with CBS Sports and Shed Media, as well as Defendants' propensity to obfuscate, to lie, and to conceal the truth. The truth of the matter is that at the same time Medcor was negotiating new contracts and proposals with CBS Sports and Shed Media, Brown was instructing CBS Sports not to sign any new Medcor contracts and Defendants were actively soliciting CBS Sports and Shed Media to work with MedWay. Not coincidentally, Brown communicated Medcor's pricing proposal to Shed Media that was apparently found to be too high, (PX 236 at MEDCOR001468) while simultaneously pushing Shed Media to Garcia and MedWay through their co-conspirator Patel. PX 235 at MEDCOR000294-295, MEDCOR000343.

Defendants also argue their actions with respect to Medcor's prospective client Carr-Hughes Productions do not violate their employment agreements, because Carr-Hughes was not a client of Medcor's. The only reason that Carr-Hughes is not a Medcor customer is because of Defendants' direct interference and diversion of this company to MedWay. ▓▓▓▓▓▓▓▓

"can get that business going forward." PX 237 at MEDCOR001466-1467. ▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓ *Id*. The only documentary evidence in this case regarding Carr-Hughes[5] demonstrates Defendants' obfuscation: Brown forwarded the Carr-Hughes inquiry to Patel so that MedWay could take the business and made up a story about the email "withering" in her inbox to cover her tracks from Medcor.[6] But for Defendants' interference, Carr-Hughes would be a Medcor client. The Carr-Hughes incident was yet another instance where Patel served as a conduit through which Brown would pass Medcor business opportunities on to MedWay. PX 16; PX 18; PX 19; PX 24; PX 37; PX 48; PX 218; PX 238 at MEDCOR000873-874.

Defendants have obtained declarations from Lisa Lettunich of Shed Media and Rodney North. (Dkt. 46, Ex. A–Ex. B). Notably, in a fraud on this Court, Garcia himself drafted Ms. Lettunich's declaration. PX 57 at GAR00081-83 ("Just sent you an updated version of the declaration. Minor tweaks, less wordy."). Ms. Lettunich's declaration was also contradicted by the sworn testimony of Defendant Brown and by Defendants' evidence.[7] Mr. North's declaration is

---

[5] Defendants allege that Carr-Hughes had been referred to both Garcia and Brown at Medcor and that, after Carr-Hughes sent Brown an inquiry for COVID Services assistance, she forwarded the inquiry to Patel with the intent that he find a provider other than Medcor to assist. Dkt. 46, Ex. C at ¶¶ 10-11. Defendants also allege that Brown "informed the Carr-Hughes representative that a contractual conflict prevented Medcor from providing the services that they had requested." *Id.* at ¶ 10. Predictably, this Brown story is simply untrue. Carr-Hughes was <u>not</u> referred to Garcia. Brown received the inquiry from Carr-Hughes on February 16, 2021, several months after Garcia was terminated. PX 18. Brown did not inform Carr-Hughes of any supposed "contractual conflict" via email (*Id.*), and Brown did not verbally inform the Carr-Hughes representative of the supposed conflict because she never spoke to him. Brown Dep. at 147:2-4.

[6] Notably, Brown contacted Garcia the day after she received the email from Medcor to confirm that MedWay got the Carr-Hughes business. PX 235 at MEDCOR000262-263.

[7] By way of example and without limitation, the declaration states that in "February 2021, Shed Media remained dissatisfied with the COVID Services it was receiving [from other vendors]," and "[a]s a result of Shed Media's dissatisfaction with its prior COVID Services vendors, [Ms. Lettunich] began exploring alternative vendors . . .". Ex. A at ¶¶ 15-16 (Dkt. 46). In fact, Brown emailed Ms. Lettunich Garcia's cell phone number on January 9, 2021, at least a month prior to the timeline given in Ms. Lettunich's declaration. PX 12. The declaration also states that Ms. Lettunich contacted Brown as a part of her efforts

7

undermined by the contemporaneous communications of the Defendants.[8]

Compounding Medcor's harm in this matter is Defendants' deliberately obstructive behavior—Defendants have repeatedly and deliberately lied about their activities,[9] and they have destroyed and withheld relevant and responsive evidence. Despite their sworn testimony to the contrary,[10] the evidence shows that Garcia and Brown have been in near constant communication

---

exploring alternative vendors, and Brown told her about MedWay and passed along Garcia's contact information. Ex. A at ¶¶ 17-18 (Dkt. 46). ███████████████

Brown Dep. at 114:22-115:15. ███████ Brown Dep. at 29:11-14. These are lies – Brown directed Ms. Lettunich to contact Garcia in early January while simultaneously telling Garcia she had a plan to feed the Shed Media business to him. PX 239 at MEDCOR0000923 ("Chris Garcia . . . He has solutions . . . I told him you would reach out to him directly.").

[8] ███████████████

Garcia Dep. at 42:10-43:14. Mr. North's employer, CBS, unsurprisingly took issue with Garcia's valid non-compete agreement with Medcor, and shied away from doing business with Garcia as a result. PX 101; Garcia Dep. at 164:12-165:1. Undeterred, in March 2021, Defendants' texts reflect that Brown passed messages from Mr. North to Garcia about ways that Garcia could restructure MedWay to mitigate the risks associated with Garcia's non-compete agreement. PX 235 at MEDCOR0000321-322.

[9] ███████████████ Patel Dep Tr. 78:16-19), while frequently discussing MedWay with her over text messages. *See* PX 238 at MEDCOR000825. Patel failed to produce these responsive text messages, which Medcor recovered through a forensic examination of Brown's phone.

[10] ███████████████ Garcia Dep. at 30:22-31:16. ███████████████ Garcia Dep. at 25:25-28:10. Garcia and Brown were communicating with one another tens of times a day – Garcia's testimony is simply not credible. Garcia also testified (and lied under oath) that he had never used another name, despite his use of the nom de guerre Augusta Masterson in his clandestine and concealed conversations with Brown (PX 235 at MEDCOR0000315, Brown refers to Augusta Masterson as "Christopher Loren Garcia").

Brown Dep. at 42:4-44:16. Brown Dep. at 195:17-18.

Brown Dep. at 29:11-14; *see generally* PX 235. Brown likewise conspired with other Medcor employees, like Kathryn Thomas, to disrupt Medcor's client relationships for the benefit of MedWay. *See, e.g.,* PX 240 at MEDCOR00819 ("Text Chris and tell him

with one another since Garcia's termination from Medcor through Facebook Messenger, both via written messages and calls, during which they explicitly discussed their conspiracy to interfere with Medcor's business relationships with its clients so as to divert work to MedWay. *See generally* PX 235. Garcia did not produce these plainly responsive messages. Brown did not produce these messages (nor did she produce any other evidence in this case, despite Medcor's requests).[11]

Similarly, the Defendants' conduct in this case belies their professed innocence. ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮ Brown Dep. at 91:22-94:11. This was an obvious attempt to delete and destroy evidence of her illicit behavior. Patel likewise has not been forthcoming, refusing to produce emails from his MedWay account on his own computer, and failing to produce other incriminating responsive text messages. Patel Dep. at 21:1-12; PX 238 at MEDCOR0000824.

Medcor doesn't know what it doesn't know about Defendants' subterfuge. And the bulk of the production by Defendants to date ends by April 2021. But Medcor's worst fears, and the most compelling evidence for the Court, are plainly and graphically set out in the exchange of Facebook Messenger communications between Brown and Augusta Masterson a/k/a Defendant Garcia located on the Medcor phone that Brown thought she had wiped before returning to Medcor.

### ARGUMENT AND CITATIONS TO AUTHORITY

A preliminary injunction should be granted when the moving party demonstrates that "(1) without preliminary relief, it will suffer irreparable harm before final resolution of its claims; (2)

---

to check the Augusta message. I need him to find a way to communicate with me before I fuck up the Medcor CBS relationship."). The "Augusta message" is a reference to Brown's and Garcia's clandestine Facebook Messenger communications.

[11] Medcor recovered the Facebook Messenger communications, along with other data, from a forensic inspection of Brown's Medcor phone. ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮ Brown Dep. at 91:22-94:11; *see* PX 241.

9

legal remedies are inadequate; and (3) its claim has some likelihood of success on the merits." *Eli Lilly and Co. v. Aria Foods, Inc.*, 893 F.3d 375, 381 (7th Cir. 2018). If the moving party demonstrates these factors, then the court balances the harms to the moving party, non-moving parties, affected third parties, and considers the public interest. *Christian Legal Soc'y v. Walker*, 453 F.3d 853, 859 (7th Cir. 2006). Medcor's motion for preliminary injunction satisfies the requisite elements, and an order preliminarily enjoining Defendants and those acting in concert with them is more than warranted in the present circumstances.

A. **Medcor Will Suffer Serious and Irreparable Harm Without Injunctive Relief and Does Not Have an Adequate Remedy at Law**

Garcia's, Patel's, and Brown's actions have caused and continue to cause Medcor to lose opportunities to provide services to paying customers, along with opportunities to retain, maintain, and develop relationships with existing and potential customers. Such losses constitute irreparable harm. *See Duct-o-wire Co. v. United States Crane*, 31 F.3d 506, 509–10 (7th Cir. 1994). Medcor's loss of customers is significant and unquantifiable at this time, making the injury irreparable. *See Mickey's Linen v. Fischer*, 2017 U.S. Dist. LEXIS 145513, at *61 (N.D. Ill. Sept. 8, 2017). Medcor has lost a substantial amount of revenue as a direct result of Defendants' actions (Dkt. 13, Ex. A at ¶ 59; PI Hearing Tr. 118:11-120:3), and ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮ Garcia Dep. at 168:24-169:7. Moreover, there is a presumption of irreparable harm because Defendants have misappropriated trade secrets from Medcor. *See Aon Risk Servs. Cos. v. Alliant Ins. Servs.*, 415 F. Supp. 3d 843, 851 (N.D. Ill. 2019). If Defendants are allowed to retain access to Medcor's Protected Information, it will continue to damage Medcor's relationships with current and prospective customers, undermine its competitive edge in marketing, lead to significant price erosion, and cause Medcor to lose further market share. *See, e.g.,* PI Hearing Tr. 118:11-120:3; *see also Vendavo*, 297 F. Supp. 3d at 1144. Medcor has no

adequate remedy at law, and has been harmed irreparably.

B.     **Medcor is Substantially Likely to Prevail on the Merits**

Medcor has a far "better than negligible" chance of success on the merits of at least one of its claims, as is required in this Circuit. *Girl Scouts of Manitou Council, Inc. v. Girl Scouts of U.S.A.*, 549 F.3d 1079, 1094-96 (7th Cir. 2008). Medcor is likely to succeed on all Counts under which it requested equitable relief in the Verified Complaint.[12]

   1.     **Trade Secret Misappropriation**

All requirements to enjoin trade secret misappropriation under the Defend Trade Secrets Act and Illinois Trade Secrets Act are met here.[13] Medcor's trade secret information (defined as the "Protected Information" in Medcor's Verified Complaint, Dkt. 1 at ¶ 25, and further detailed in PX 242 at MEDCOR0002444), is valuable and not generally known by the public or easily accessible to those inside or outside of the company. Dkt. 13, Ex. A at ¶ 16; *see also* PI Hearing Tr. 37-40, 53-55, 89-90, 109, 118-122. The types of Protected Information misappropriated by Defendants in this case, including client information, client contact information, pricing information, business strategies and marketing strategies for COVID Services, likewise constitute protectable trade secrets. *See, e.g., APC Filtration v. Becker*, 646 F. Supp. 2d 1000, 1010 (N.D. Ill. 2009) (client information, client product preferences, quotes, costs, and margins constitute

---

[12] Medcor directs the Court to the discussion of its Tortious Interference of Contract claims, Breach of Duty of Loyalty claims, and Trademark Infringement and Unfair Competition claims, as well as a more fulsome discussion of the relevant legal authorities for its Trade Secret Misappropriation and Breach of Contract claims, in its Memorandum of Law in Support of Plaintiff's Motion for a Temporary Restraining Order and Preliminary Injunction. (Dkt. 13).

[13] A court may enjoin misappropriation of trade secrets under the Defend Trade Secrets Act ("DTSA") where: (1) the information is a trade secret used or intended for use in interstate or foreign commerce, and (2) has been, or is threatened to be, misappropriated. 18 U.S.C. § 1836(b)(1), 1836(b)(3)(A). The Illinois Trade Secrets Act ("ITSA") provides for similar relief under the same factors, while additionally requiring a showing that the trade secret was used by the defendant. *See* 765 ILCS 1065/3; *Covenant Aviation Sec., LLC v. Berry*, 15 F. Supp. 3d 813, 817-19 (N.D. Ill. 2014); *Strata Mktg., Inc. v. Murphy*, 317 Ill. App. 3d 1054, 1068-69 (1st Dist. 2000).

trade secrets); *Vendavo, Inc. v. Long*, 397 F. Supp. 3d 1115, 1131-33 (N.D. Ill. 2019) (business strategies, marketing strategies, names and addresses of potential customers constitute trade secrets); Dkt. 13, Ex. A at ¶¶ 13-15; PI Hearing Tr. 37-40, 89-90. ███████████████████████████████████████████████████████████████████████████████████. Garcia Dep. at 66:4-68-11; Patel 52:17-53:2; Brown 85:8-88:7. The steps Medcor has taken to safeguard its Protected Information, including password and database protection in connection with its software and systems, restricting Protected Information and access to certain employees, and requiring employees like Garcia and Brown to sign agreements acknowledging Medcor's safeguards of the confidentiality of such information (PX 242–PX 244; *see also* PX 246–PX 251), are more than sufficient to maintain the status of trade secrets. *See RKI, Inc. v. Grimes*, 177 F. Supp. 2d 859, 874 (N.D. Ill. 2001) (password protections, restricting potential client information and access to certain employees, database protection and on-site office locks sufficient to maintain the status of a trade secret); Dkt. 13, Ex. A at ¶¶ 15-16; PI Hearing Tr. 53-55.

This Court has the power to enjoin both "threatened" and "actual" misappropriation—both are present here. 765 ILCS 1065/3. Defendants misappropriated Protected Information, including but certainly not limited to client information, client contact information, pricing information, business strategies and marketing strategies for COVID Services, and used and continue to use such misappropriated information to divert Medcor business to MedWay.

The doctrine of inevitable disclosure doctrine is especially applicable here. MedWay offers the same services as Medcor to the same customers. Dkt. 13, Ex. A at ¶¶ 28, 34, 47; Garcia Dep. at 123:7-10. Garcia, as the founder of MedWay and its sole employee, is certainly comparable to the position he held at Medcor. Garcia Dep. at 227:1-22. Patel is MedWay's

ordering physician, the same position he held at Medcor. Garcia Dep. at 28:20-29:1. There are no other ordering physicians at MedWay. *Id.* ▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓ Garcia Dep. at 123:11-18. Garcia has not taken any steps to prevent himself from using or disclosing the trade secrets he himself misappropriated from Medcor.

### 2. Breach of Contract Claims

Medcor is likely to succeed on its breach of contract claims. Garcia, Patel and Brown voluntarily entered into agreements governed by Illinois law with restrictive covenants in exchange for valid consideration. PX 11; PX 25; PX 29–PX 32. Garcia, Patel and Brown breached their respective agreements, and Medcor has suffered significant damages as a result.

Defendants appear to rely on a curious—and completely legally unsupported—legal theory regarding the term "solicitation" and contorted reasoning relating to who first contacts whom. *See* Dkt. 46, Ex. A–Ex. B. Notably, this District has consistently held that "solicitation does not hinge on who contacts whom," and "courts applying Illinois law have defined solicitation to encompass any direct contact that the recipient would understand as a solicitation for business." *Gateway Sys. v. Chesapeake Sys. Sols.*, No. 10 C 2276, 2010 U.S. Dist. LEXIS 95470, at *10-11 (N.D. Ill. Sep. 14, 2010). Defendants had direct contact with Medcor customers and solicited them to do business with MedWay.

### C. The Balance of Harms Weighs in Favor of Granting the Requested Relief, and the Public Interest Requires That a Preliminary Injunction Be Granted

"Balancing the irreparable harm to the moving party if an injunction is not entered against the harm to the non-moving party if an injunction is granted requires the Court to use a sliding-scale approach; the more likely the plaintiff will succeed on the merits, the less the balance of irreparable harms need favor the plaintiff's position." *Vendavo*, 397 F. Supp. 3d at 1145 (internal citations omitted). "[W]here the injunctive relief sought primarily focuses on prohibiting a

defendant from using information he should not have taken in the first place, the balance of harms weighs heavily in favor of granting an injunction." *Id*. Any harm Defendants may suffer as a result of Medcor's requested injunction would be a consequence of their own intentional conduct. Moreover, any burden placed on third parties like Shed Media as a result of the injunction would be minimal, as such entities are both aware of and have contracted with other companies that provide COVID Services, and such services are provided and contracted for on temporally-limited, event-by-event bases. Likewise, there is a clear public interest in enforcing valid contracts and in protecting companies' confidential information. The balance of harms weighs heavily in favor of Medcor, and the public interest requires that a preliminary injunction be granted.

**D.    Illinois Law Applies to This Action**

In response to the questions posed by the Court at the Preliminary Injunction Hearing, Illinois law is controlling in this dispute, including Medcor's contract claims. California Labor Code Section 925 does not apply to claims arising outside of California, or to claims by employees who do not primarily reside and work in California. *See, e.g.*, *Mechanix Wear, Inc. v. Performance Fabrics, Inc.,* 2017 U.S. Dist. LEXIS 13357, at *18-19 (C.D. Cal. 2017); *Felley v. Am. Fujikura Ltd.*, 2018 U.S. Dist. LEXIS 137565, at *5 (E.D. Cal. 2018). The claims in this case arise in Illinois. *See Chicago Bears Football Club, Inc. v. Haynes*, 816 F. Supp. 2d 534, 535 (N.D. Ill. 2011) (no basis for applying California law and policy when Illinois law governed the formation and construction of the agreements, business was located in Illinois, employees executed and substantially performed agreement in Illinois, and parties assented to Illinois choice of law provisions in contract). The contracts that are the subjects of Medcor's breach of contract claims in this case are governed by Illinois law and Defendants agreed to such Illinois choice of law provisions. Garcia and Brown agreed to injunctive relief as a remedy in the event of a breach of

their restrictive covenants. PX 11 at MEDCOR0000020; PX 30 at MEDCOR0000136. Medcor's headquarters is located in Illinois, from which Medcor operates its business and stores the trade secrets that Defendants misappropriated. ███████████████████████ ███.[14] Moreover, even assuming *arguendo* that California law applies to Medcor's contract claims, which Medcor does not concede, California Business and Professions Code Sec. 16600 does not apply to post-employment restrictions enforceable to the extent necessary to protect an employer's trade secrets. *See The Ret. Grp. v. Galante*, 176 Cal. App. 4th 1226, 1238 (2009).

## CONCLUSION

Medcor respectfully requests that this Court issue a Preliminary Injunction Order enjoining the Defendants, directly or indirectly, alone or in concert with others, from: (A) Possessing, using, disclosing, or transmitting Medcor's Protected Information, including but not limited to Medcor pricing information, Medcor customer proposals Medcor testing procedures and protocols, Medcor customer contact information, and Medcor contracts; (B) Directly or indirectly engaging in activities that are competitive with the business activities of Medcor as of December 9, 2020 for six (6) months from the Court's injunction grant; (C) Directly or indirectly soliciting any Medcor employees, any Medcor customers, related production entities or projects as of December 9, 2020 for any services of any kind for six (6) months from the Court's injunction grant; and (D) Directly or indirectly passing off Medcor's experiences as Defendants' own. As relates to MedWay's ongoing work for Shed Media, Medcor requests at a minimum that the Court order that Medway's revenues from Shed Media be placed in a constructive trust for the benefit of Medcor pending final disposition of this case.

---

[14] ██████████████████████████████████████████████████████████████████. Garcia Dep. at 131:23-132:16. Garcia also has a New Jersey business address. PX 168 at GAR02582.

Dated: November 1, 2021                                         Respectfully Submitted,

By:   /s/Dalton K. Hughes
      William H. Frankel
      wfrankel@crowell.com
      Virginia W. Marino
      vmarino@crowell.com
      Dalton K. Hughes
      dhughes@crowell.com
      Crowell & Moring LLP
      NBC Tower, Suite 3600
      455 N. Cityfront Plaza Drive
      Chicago, IL 60611
      Telephone: (312) 321-4200


      *Counsel for Plaintiff MEDCOR, Inc.*


      Anthony W. Mattivi
      Anthony.Mattivi@medcor.com
      MEDCOR, Inc.
      4805 Prime Parkway
      P.O. Box 550 McHenry, IL 60050
      Telephone: (815) 363-9500


      *Of Counsel for Plaintiff MEDCOR, Inc.*

## **CERTIFICATE OF SERVICE**

I hereby certify that on November 1, 2021, a true and correct copy of the foregoing was electronically filed via the Court's ECF system under a provisional seal simultaneously with a redacted public version, the cited exhibits, and a Motion for Leave to File Under Seal. A copy of the foregoing and the cited exhibits under provisional seal have been provided to the Court and Defendants' counsel via the parties' emails listed in the Court's ECF system.


Dated: November 1, 2021                                        /s/Dalton K. Hughes