UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

MEDCOR, INC.,

        Plaintiff,

    v.

CHRISTOPHER GARCIA, et al.,

        Defendants.

No. 21 CV 2164

Judge Manish S. Shah

**MEMORANDUM OPINION AND ORDER**

Plaintiff Medcor, Inc. alleges that by starting a rival company, using confidential information, and soliciting clients and employees, defendants Christopher Garcia, Amanda Brown, Ravi Patel, and MedWay Health, Inc. breached contracts and violated state and federal trade secret laws. Medcor moves for a temporary restraining order and preliminary injunction enjoining further competition and use of confidential information. For the reasons that follow, plaintiff's motion is granted in part, denied in part.

## I. Standard of Review

The standards for issuing a temporary restraining order and a preliminary injunction are identical. *Mays v. Dart*, 453 F.Supp.3d 1074, 1087 (N.D. Ill. 2020) (citations omitted). A preliminary injunction is "an extraordinary remedy never awarded as of right." *See Winter v. Nat. Res. Def. Council, Inc.*, 555 U.S. 7, 24 (2008). A plaintiff seeking a TRO or preliminary injunction "must establish that he is likely

to succeed on the merits, that he is likely to suffer irreparable harm in the absence of preliminary relief, that the balance of equities tips in his favor, and that an injunction is in the public interest." *Protect Our Parks, Inc. v. Buttigieg*, 10 F.4th 758, 763 (7th Cir. 2021) (quoting *Winter*, 555 U.S. at 7). Although Medcor doesn't need to show that it will definitely win the case, Medcor must show that it has "some likelihood" of succeeding on the merits. *Mays v. Dart*, 974 F.3d 810, 822 (7th Cir. 2020) (quoting *Speech First, Inc. v. Killeen*, 968 F.3d 628, 637 (7th Cir. 2020)).

## II. Facts

Medcor provided onsite health services to clients throughout North America. [66] at 23–24.[1] During the COVID-19 pandemic, Medcor developed a screening system and testing protocol based on Centers for Disease Control and Prevention guidance, and provided clients with related health security screening, testing, and worksite exposure management. *Id.* at 27–28, 30–36. Garcia and Brown were employees at Medcor, [81] ¶¶ 19, 20, and directed the operation of its COVID-19

---

[1] Bracketed numbers refer to entries on the district court docket. Referenced page numbers are taken from the CM/ECF header placed at the top of filings. The facts are taken from the preliminary injunction hearing, [66], the amended complaint (to the extent the allegations are not disputed), [81], and from exhibits filed with the parties' briefs. Any document previously filed under seal and referenced in this opinion should be unsealed; by February 16, 2022 the parties shall file a joint statement identifying the docket entries for unsealing or stating a basis for continued secrecy, with a proposed deadline for filing public versions of documents redacting only trade-secret information. *See Baxter Int'l, Inc. v. Abbott Labs.*, 297 F.3d 544, 546 (7th Cir. 2002) (citations omitted) ("In civil litigation only trade secrets, information covered by a recognized privilege (such as the attorney-client privilege), and information required by statute to be maintained in confidence (such as the name of a minor victim of sexual assault), is entitled to be kept secret on appeal."). Commercially sensitive information can be kept secret at the discovery stage, but general interests in commercial advantage and privacy aren't sufficient reasons to keep information relevant to judicial decision-making secret. See *id.* at 545.

screening and testing services. [13-1] ¶¶ 13, 18–19. Patel, a doctor, provided on-site physician services to Medcor clients. [81] ¶ 21; [13-1] ¶ 20.

Medcor hired Garcia to be its operations manager in fall 2019. *See* [69-12]. His contract included restrictions on the use of Medcor's trade secrets and proprietary information, *id.* at 10–16, along with non-solicitation and non-compete clauses. *Id.* at 16–18. Around the same time, Medcor hired Brown as a medical administrator. *See* [69-6]. Later, Brown was promoted to operations director. *See* [69-10]. Like Garcia's contract, both of Brown's written employment agreements with Medcor included a prohibition on the use of the company's trade secrets and proprietary information, [69-6] at 5–6; [69-10] at 4–8, and non-solicitation and non-compete clauses. [69-6] at 6; [69-10] at 8–9. Patel entered into two agreements with Onsite Physician Services of Illinois, SC, and promised to provide medical services to Medcor clients. *See* [69-13]; [69-14]. The first of Patel's agreements, *see* [69-14], was superseded by the second. *See* [69-13] at 6. Patel's second contract with Onsite included a non-disclosure agreement. *See* [69-13] at 10–12.

Medcor fired Garcia in December 2020. [81] ¶ 4; *see* [69-11]. A day later, Garcia used his cell phone to take photographs of documents displayed on his Medcor laptop. *See* [74-3] at 89–121. The documents were Medcor contracts and proposals, and included client contact information, screening and testing protocols, business plans, and pricing information. *See* [69-16]; [69-17]; [69-18]; [69-19]; [69-20]; [69-21]; [69-22]; [69-23]; [69-24]; [69-25]; [74-3] at 89–121. Garcia said he took the photographs so that he could use the formatting and structure of Medcor's documents as templates for a

3

company that he was starting. *See* [74-3] at 116–17, 120–21. Garcia registered a website for that company, MedWay, three days after he was fired, and incorporated the business a month later. *See* [13-1] ¶ 33.

Three months after he was fired, Garcia was featured on a webinar where he suggested that MedWay had been in operation since the beginning of the pandemic and took credit for work completed by Medcor, attributing his personal experiences working for Medcor and its clients to MedWay. *See* [70-5]; [74-3] at 224–231. Around the same time, Garcia communicated with a Medcor employee about staffing needs at MedWay events and getting her out of an employment contract with Medcor. *See* [74-3] at 180–200.

After Garcia founded MedWay, Medcor lost the business of two existing clients: CBS Sports and Shed Media. Shed Media became MedWay's largest client, *see* [74-3] at 140–41, while CBS Sports entered into negotiations with MedWay but ultimately chose a different vendor for its COVID screening and testing services. *See* [74-4] at 88–90; [46-2]. The parties dispute whether Medcor lost these accounts because of defendants' actions or because CBS and Shed were dissatisfied with plaintiff's services and pricing. *See* [74-1] at 8–12; [69-1] at 4–6.

Messages between Garcia and Brown[2] show that Garcia and MedWay wanted the CBS account, Garcia fed Brown negative information to relay to CBS, Brown

---

[2] In his deposition, Garcia said that he last communicated with Brown in January or February 2021, *see* [74-3] at 30–31, and couldn't remember communicating with her over Facebook Messenger or about MedWay. *See id.* at 24–28. Brown said that she last talked with Garcia at the end of his employment (in December 2020), [74-6] at 42, and had never communicated with Garcia over Facebook Messenger. *Id.* at 44. Brown also said that she

4

instructed a CBS executive not to sign additional contracts with Medcor in anticipation of a deal with MedWay, and Brown, hoping to join MedWay, contemplated disrupting the relationship between Medcor and CBS. *See* [70-41] at 57–76. Patel paid for a golf outing with a CBS executive and Garcia, and the three men also went to dinner together. *See* [74-3] at 34–35. But emails between Medcor and CBS executives show that CBS had some problems with Medcor's services, *see* [74-5], and that the company continued to negotiate with Medcor on future contracts even after Brown was fired in April 2021. *See* [74-8]; [74-9]; [74-10]. Although the evidence is mixed, I find that defendants exploited an opening between CBS and Medcor and caused Medcor to lose the CBS account.

A Shed executive asked Brown to send Garcia's phone number to her in January 2021, and Brown sent the executive Garcia's contact information. *See* [46-1] ¶¶ 17–18; [70-7]. Brown forwarded email exchanges about the Shed–Medcor proposal process to Patel. *See* [69-7]; [69-15]. Garcia credited Brown with delivering Shed to MedWay, *see* [70-41] at 83, and Patel congratulated Garcia for winning the Shed account. *See* [70-31] at 120. But a Shed executive said Medcor lost the account because of higher pricing, and that Garcia hadn't contacted her after his firing. *See*

---

wasn't aware of MedWay until learning about it during an interview with a Medcor employee. *Id*. at 29. But Facebook Messenger communications recovered from Brown's cellphone show that Brown and Garcia were frequently communicating on the platform in March 2021 and spoke often about MedWay. *See* [70-41] at 55 (Garcia used an account under another name). These inconsistencies and Brown's related attempt to destroy evidence, *see* [70-47]; [74-6] at 91–94, render Garcia and Brown unreliable and incredible. I give no weight to their testimony unless undisputed or corroborated by contemporaneous reliable documents.

[46-1] ¶¶ 13–23.[3] In an email to Brown from January 2021, the Shed executive attached a competing firm's pricing, and Brown told Medcor executives that pricing was an issue for Shed. *See* [74-13]. After turning down Medcor's proposal, *see* [74-15], Shed hired a third party (not MedWay) to provide COVID screening and testing services. *See id.*; [46-1] ¶ 13. Shed's executive later contracted with MedWay because of her past relationship with Garcia and because MedWay's pricing fell within Shed's budget. *See* [46-1] ¶¶ 14–23. As with CBS, the evidence about Shed is mixed but I conclude that Medcor lost the Shed account because of pricing, not defendants' conduct.

The parties also dispute whether defendants diverted the business of a potential Medcor client, Carr-Hughes Productions. *See* [74-1] at 12–13; [69-1] at 6–7. Brown received an inquiry from Carr-Hughes on February 16, 2021, and forwarded that email exchange to Patel. *See* [69-8].[4] Emails between Brown and others at Medcor a month later show that Brown did not follow up on the Carr-Hughes business on behalf of Medcor. *See* [69-28]. A day after she was asked about the status of the Carr-Hughes inquiry by Medcor executives, *see id.*, Brown messaged Garcia to inquire whether he was doing business with Carr-Hughes. *See* [70-41] at 2–3. But

---

[3] Medcor argues that the Shed executive's affidavit isn't credible because Garcia edited it, *see* [70-19], but the fact that Garcia edited the statement before the executive signed it doesn't mean that the statement is false. That the executive misremembered which month she asked Brown for Garcia's contact, *see* [46-1] ¶¶ 15–18, doesn't destroy the statement's credibility, either. But I give less weight to the affidavit than if it were an independent statement free from biased influence.

[4] Brown also forwarded another email from what appears to be a Medcor client to Patel. *See* [69-9].

6

Brown said that Medcor had decided not to pursue clients like Carr-Hughes. [46-3] at 3–4. And a Medcor executive said that the company had generally decided not to pursue clients like Carr-Hughes because of concerns about costs, and that such clients were low priority for the company. *See* [74-4] at 187–188. Medcor didn't secure the Carr-Hughes business because it was a low priority for the company.

Medcor filed this lawsuit in April 2021. [1]. Medcor moved for a preliminary injunction and temporary restraining order, [12], and the parties conducted limited, expedited discovery. *See* [33]. Plaintiff seeks injunctive relief on the basis of (1) breach of contract; (2) tortious interference of contract; (3) violations of the Defend Trade Secrets Act and the Illinois Uniform Trade Secrets Act; (4) state and federal claims for unfair competition and trademark infringement; and (5) breach of the duty of loyalty. *See* [12]; [81].[5]

A member of the senior management team and shareholder at Medcor testified at the preliminary injunction hearing. *See* [66] at 21. In general, the Medcor executive testified about defendants' employment with the company, their contracts with Medcor, and the confidential nature of the documents that Garcia photographed. *See* [66]. The presentation of evidence was not completed in the time allotted, and by agreement, instead of reconvening the hearing, the parties took depositions and further briefed the motion. *See* [65]; [74-3]; [74-6]; [74-7].

---

[5] Medcor filed an amended complaint, [81], which added defendant Katherine Thomas to the case and includes additional claims for (1) intentional interference with prospective economic advantage; (2) fraud in the inducement; (3) negligent inducement; (4) violation of the Illinois Uniform Deceptive Trade Practices Act; and (5) civil conspiracy. Because defendants have not yet answered the amended complaint and the evidentiary record for the motion has already been established, I ignore additional facts alleged in the amended complaint.

## III.  Analysis

### A.  Likelihood of Success on the Merits

#### 1.  *Choice of Law*

Garcia argues that Medcor's breach of contract and trade secret claims against him are governed by California law, citing his contract's choice-of-law provision. *See* [74-1] at 13–15. The contract says that "[e]xcept in California and any other State where prohibited by law, this Agreement shall be governed by the laws of Illinois regarding contracts made and entered into in Illinois and without regards to conflict of laws principles." [69-12] at 23. Medcor doesn't dispute that Garcia lived and worked in California during his employment with Medcor. *See* [69-1]; *see also* [81] ¶ 19.

A federal court exercising supplemental jurisdiction over state-law claims applies the choice-of-law rules of the forum state. *See McCoy v. Iberdrola Renewables, Inc.*, 760 F.3d 674, 684 (7th Cir. 2014) (citing *Felder v. Casey*, 487 U.S. 131, 151 (1988); *Houben v. Telular Corp.*, 309 F.3d 1028, 1032 (7th Cir. 2002)). Under Illinois choice-of-law rules, Illinois law applies "unless an actual conflict with another state's law is shown, or the parties agree that forum law does not apply." *Sosa v. Onfido, Inc.*, 8 F.4th 631, 637 (7th Cir. 2021) (quoting *Gunn v. Cont'l Cas. Co.*, 968 F.3d 802, 808 (7th Cir. 2020)).

Garcia argues that California law is in actual conflict with Illinois law because California doesn't enforce restrictive covenants like those in his contract and doesn't recognize the doctrine of inevitable disclosure. *See* [74-1] at 15, 23 (citing Cal. Bus. & Prof. Code § 16600; *Globespan, Inc. v. O'Neil*, 151 F.Supp.2d 1299, 1235 (C.D. Cal.

2001)). Assuming that Garcia is right that an outcome-determinative conflict exists between Illinois and California law, the analysis turns to the contract's choice-of-law provision, and to the Second Restatement of Conflict of Laws. *See Townsend v. Sears, Roebuck and Co.*, 227 Ill.2d 147, 163 (2007).

The parties selected Illinois law to govern the agreement "[e]xcept in California." [69-12] at 23. Garcia wants to read that exception to mean "except as applied to a California resident," or "except as applied to claims arising out of work performed in California." *See* [74-1] at 13–15; [46] at 7–8. But I take the clause to mean that Illinois law applies except when claims are brought in California, and so the parties chose Illinois law to govern the claims in this case, brought in an Illinois federal court.[6]

Given that the parties chose Illinois law to govern their agreement, under § 187 of the Restatement, Illinois law applies to Medcor's breach of contract claim unless either (1) Illinois has "no substantial relationship to the parties or the transaction" or (2) applying Illinois law would be "contrary to a fundamental policy" of California and California has a materially greater interest than Illinois in the case and California law would have been selected "in the absence of an effective choice of

---

[6] Even if the exception in Garcia's contract's choice-of-law clause meant that the contract's choice of Illinois law didn't apply to certain claims against him, that doesn't mean that the parties chose California law to govern the agreement. *See* Restatement (Second) of Conflict of Laws § 188 (Am. L. Inst. 1971). "Except in California" does not mean California law applies. At most, it means that a dispute defaults to the choice-of-law rules applied by the court hearing a claim. As discussed below, even in the absence of an effective choice of law by the parties, the claims in this case are likely governed by Illinois law.

law by the parties." Restatement (Second) of Conflict of Laws § 187 (Am. L. Inst. 1971).

Illinois has a substantial relationship to the parties and the transaction because Medcor is an Illinois corporation. *See* [81] ¶ 18. And even if application of Illinois law to a California employee would be contrary to a fundamental policy of California (*see* Cal. Lab. Code § 925), Garcia hasn't shown why California has a materially greater interest in this case than Illinois does. *See* Restatement (Second) of Conflict of Laws § 188 (Am. L. Inst. 1971); *see also Dancor Constr., Inc. v. FXR Constr., Inc.*, 407 Ill.Dec. 997, 1016 (2d Dist. 2016) (citing *Maher & Associates*, 267 Ill.App.3d 69, 77 (2d Dist. 1994)) ("Illinois follows the modern approach to choice-of-law questions, placing the greatest importance on the public policy of the state in which the case is brought.").

Illinois law probably applies to Medcor's contract claim against Garcia. Whether Illinois or California law applies to Medcor's state-law trade secrets claim is a thornier question. *See JST Corp v. Foxconn Interconnect Tech. Ltd.*, 965 F.3d 571, 577 n.1 (7th Cir. 2020) (citation omitted); *Vendavo, Inc. v. Long*, 397 F.Supp.3d 1115, 1127 (N.D. Ill. 2019) (discussing the application of a narrow contractual choice-of-law clause to related tort claims). It isn't necessary to decide that issue now, however, because Medcor brought a federal claim under the Defend Trade Secrets Act, *see* [81], and so the application of the inevitable disclosure doctrine to plaintiff's state-law trade secrets claim isn't outcome determinative at this stage in the case. *See PepsiCo, Inc. v. Redmond*, 54 F.3d 1262, 1268 (7th Cir. 1995); *Packaging Corp. of America, Inc.*

*v. Croner*, 419 F.Supp.3d 1059, 1069 n.7 (N.D. Ill. 2020) (concluding that the Seventh Circuit is likely to recognize the inevitable disclosure doctrine under DTSA and gathering cases).

### 2. *Breach of Contract*

Medcor brings breach of contract claims against Garcia, Brown, and Patel. *See* [81] at 39–42. To prove a breach of contract claim in Illinois, Medcor must show "(1) offer and acceptance, (2) consideration, (3) definite and certain terms, (4) performance by the plaintiff of all required conditions, (5) breach, and (6) damages." *MC Baldwin Fin. Co. v. DiMaggio, Rosario & Veraja, LLC*, 364 Ill.App.3d 6, 30 (1st Dist. 2006) (citations omitted); *see Hess v. Bresney*, 784 F.3d 1154, 1158–59 (7th Cir. 2015) (citation omitted).

Medcor alleges that defendants breached restrictive covenants in their contracts. *See* [13] at 5–8; [69-1] at 13. A restrictive covenant is only valid if reasonable, meaning that the covenant: (1) is no greater than is required for the protection of a legitimate business interest of the employer; (2) does not impose undue hardship on the employee; and (3) is not injurious to the public. *Reliable Fire Equip. Co. v. Arredondo*, 358 Ill.Dec. 322, 326–27 (2011) (citations omitted). The extent of the employer's legitimate business interest may be limited by type of activity, geographical area, and time. *Id.* at 325–26 (citing Restatement (Second) of Contracts § 188 (Am. L. Inst. 1981)). Whether a legitimate business interest exists depends on the totality of the circumstances. *Id.* at 332; *see Instant Tech. LLC v. DeFazio*, 793 F.3d 748, 750 (7th Cir. 2015). Undue hardship is about whether a restriction

11

unreasonably limits an employee's ability to work, *see Mohanty v. St. John Heart Clinic, S.C.*, 225 Ill.2d 52, 76–77 (2006), and covenants injure the public when they violate public policy. *See id.* at 64–69.

Garcia's and Brown's contracts prohibited them from using or disclosing Medcor's trade secrets and proprietary information, competing with Medcor, soliciting Medcor employees, and soliciting current or prospective Medcor clients. *See* [69-12] at 10–18; [69-6] at 5–7; [69-10] at 4-9. Medcor has made a threshold showing as to the enforceability of these restrictions. *See* [13] at 6–8. Garcia's only argument that the restrictions in his contract aren't enforceable is based on California law, *see* [74-1] at 15–16; [46] at 6–9, but, as discussed above, Illinois law likely applies to Medcor's contract claim against Garcia. For the purposes of the preliminary injunction, Garcia has forfeited other arguments about the enforceability of the restrictive covenants in his contract. *See Cassell v. Snyders*, 990 F.3d 539, 551 (7th Cir. 2021) (indicating that arguments that aren't raised are forfeited for the purposes of a motion for preliminary injunction).

Brown is not represented by counsel, but Garcia and MedWay argue that the restrictive covenants in her contract fail for lack of consideration. *See* [74-1] at 25. Illinois courts carefully scrutinize the consideration supporting postemployment restrictive covenants, and continued employment for less than three months wouldn't on its own be sufficient to support such restrictions. *See Fifield v. Premier Dealer Servs., Inc.*, 373 Ill.Dec. 379, 383 (1st Dist. 2013); *Diederich Ins. Agency, LLC v. Smith*, 351 Ill.Dec. 792, 795–96 (5th Dist. 2011). But because Brown allegedly

breached her contract with Medcor while employed with the company, *see* [69-1], the issue here is the enforceability of these restrictions *during* Brown's employment. Even if the consideration analysis mirrors that for post-employment restrictions, Brown appears to have been promoted when she signed her second Medcor contract, *see* [69-10], and based on the totality of circumstances there is some likelihood that the post-employment restrictions included in Brown's agreement were supported by adequate consideration. *See Allied Waste Servs. of N. America, LLC v. Tibble*, 177 F.Supp.3d 1103, 1107–09 (N.D. Ill. 2016) (predicting that the Illinois Supreme Court would not embrace a bright-line rule requiring two years of continued employment to enforce a postemployment restrictive covenant, but would instead consider the totality of the circumstances); *Guaranteed Rate, Inc. v. Wilson*, Case No. 20-cv-1663, 2020 WL 4736395, at *3 (N.D. Ill. Aug. 14, 2020). For the purposes of this motion, Brown has forfeited other arguments as to the enforceability of the restrictive covenants in her contract. *See Cassell*, 990 F.3d at 551.

Garcia agreed not to compete with Medcor in the six months after the end of his employment with the company. *See* [69-12] at 17–18. But he incorporated MedWay a month after he was fired, and MedWay provided COVID-19 services similar to those offered by Medcor to a national market. *See* [13-1] ¶ 33; [66] at 23–25; [81] ¶ 2; [74-3] at 131–32. Garcia also agreed not to use Medcor's proprietary information for the benefit of a competitor and to return all Medcor contracts and proposals following his employment. *See* [69-12] at 14. Yet Garcia photographed and retained Medcor confidential documents in order to help set up a competing company.

*See* [74-3] at 89–121. Finally, Garcia promised not to solicit Medcor clients or prospective clients, *see* [69-12] at 16–17, but he negotiated for COVID work with executives at two Medcor clients, CBS Sports and Shed Media. *See* [46-2]; [46-1]. That these clients may have initially contacted Garcia doesn't mean Garcia didn't solicit their business. *See Gateway Sys., Inc. v. Chesapeake Sys. Solutions, Inc.*, No. 10 C 2276, 2010 WL 3714588, at *3 (N.D. Ill. Sept. 14, 2010) (citations omitted) (finding that solicitation under Illinois law includes "any direct contact that the recipient would understand as a solicitation for business"). Medcor has shown some likelihood that Garcia breached the non-compete, non-disclosure, and non-solicitation clauses in his contract.[7]

Brown agreed not to disclose Medcor's trade secrets or proprietary information except as authorized by the company, not to solicit Medcor clients for anyone except Medcor, and not to compete with plaintiff. *See* [69-10] at 6–9. Medcor claims that Brown breached her contract when she sent emails concerning proposals for new business to Patel. *See* [69-1] at 6–7; [13] at 2–3. But the fact that Brown was sending Patel (then serving Medcor clients) emails about Medcor proposals doesn't show that Brown was soliciting those clients or competing with Medcor. However, the information in the emails Brown sent to Patel seems likely to be covered by the contract's definition of proprietary information, *see* [69-8]; [69-10]; [69-7]; [69-15], and

---

[7] Medcor also argues that Garcia breached his contract by soliciting Medcor employees. *See* [69-1] at 5. Garcia was prohibited from using the company's proprietary information or trade secrets to solicit Medcor's employees, and plaintiff hasn't shown that Garcia used such information to solicit defendant Thomas or other Medcor employees. *See id.*; [74-3] at 180–200. Medcor isn't likely to succeed on this theory for its breach of contract claim.

Medcor has shown some likelihood that Brown interfered with the Medcor–CBS relationship and tried to divert Shed Media to support Garcia and MedWay. *See* [70-41] at 58–76. Medcor has shown some likelihood that Brown breached her contract's non-disclosure and non-compete clauses.

Medcor argues that Patel breached restrictive covenants in his contracts, *see* [69-1] at 13; [13] at 5–8, but hasn't adequately shown that Medcor was the beneficiary of Patel's agreements with Onsite Physician Services. *See Sosa v. Onfido, Inc.*, 8 F.4th 631, 639 (7th Cir. 2021) (quoting *Marque Medicos Farnsworth, LLC v. Liberty Mut. Ins. Co.*, 427 Ill.Dec. 218 (1st Dist. 2018)) ("Illinois courts ... recognize a 'strong presumption against conferring contractual benefits on noncontracting third parties.'"); *see* [69-13] at 9 (Patel's contract expressly bars third-party beneficiaries). Medcor also hasn't explained how Patel allegedly breached his contract with the company, *see* [13] at 6, or why his initial agreement with Onsite continued to govern his conduct even after it was superseded by his second. *See* [69-14]; [69-13]. Plaintiff's general allegations are insufficient to show that Patel breached any contract. *See* [69-1] at 13; [13] at 5–8.

Medcor has shown some likelihood of success on the merits of its contract claims against Garcia and Brown, but has not made a sufficient showing against Patel.

### 3.   Trade Secrets

Medcor brings state and federal claims for trade secret misappropriation against Garcia, MedWay, Brown, and Patel. *See* [81] at 47–52; [1] at 43–49.[8] Under the Defend Trade Secrets Act, 18 U.S.C. § 1836(b), information is a trade secret if (1) the owner has taken reasonable measures to keep the information secret, and (2) the information "derives independent economic value, actual or potential, from not being generally known to, and not being readily ascertainable through proper means by, another person who can obtain economic value from the disclosure or use of the information." 18 U.S.C. § 1839(3); *see Life Spine, Inc. v. Aegis Spine, Inc.*, 8 F.4th 531, 540 (7th Cir. 2021). Whether information is a trade secret is a question of fact to be decided based on all of the surrounding circumstances. *Life Spine*, 8 F.4th at 540 (quoting *Learning Curve Toys, Inc. v. PlayWood Toys, Inc.*, 342 F.3d 714, 723 (7th Cir. 2003)). Misappropriation happens when a person acquires a trade secret by improper means or discloses or uses a trade secret without consent. 18 U.S.C. § 1839(5). Improper means include "theft, bribery, misrepresentation, breach or inducement of a breach of a duty to maintain secrecy, or espionage through electronic or other means." 18 U.S.C. § 1839(6).

After he was fired, Garcia took photographs of Medcor contracts and proposals. *See* [69-16]; [69-17]; [69-18]; [69-19]; [69-20]; [69-21]; [69-22]; [69-23]; [69-24]; [69-25];

---

[8] Because the analysis under Illinois law is largely identical to that under DTSA, *see Vendavo, Inc. v. Long*, 397 F.Supp.3d 1115, 1128–29 n.5 (N.D. Ill. 2019); *Molon Motor & Coil Corp. v. Nidec Motor Corp.*, No. 16 C 03545, 2017 WL 1954531, at *2 (N.D. Ill. May 11, 2017), I address only Medcor's federal claims.

16

[74-3] at 89–121. By identifying these particular documents and distinguishing the trade secrets allegedly included in those documents from other information found there, *see* [69-1] at 3, 11–13, Medcor has described the trade secrets Garcia allegedly took with the required specificity. *See Life Spine*, 8 F.4th at 540 (quoting *Composite Marine Propellers, Inc. v. Van Der Woude*, 962 F.2d 1263, 1266 (7th Cir. 1992)) ("Trade secret law focuses on the 'concrete secrets' that the plaintiff seeks to protect, rather than 'broad areas of technology.'"); *Vendavo, Inc. v. Long*, 397 F.Supp.3d 1115, 1130 (N.D. Ill. 2019) (collecting cases).[9]

Medcor alleges that Garcia took (1) client information, including contact information; (2) pricing information; (3) business strategies; and (4) marketing strategies. [69-1] at 11. Garcia doesn't dispute that Medcor took reasonable steps to protect this information, *see* [74-1], and plaintiff has offered evidence that the documents Garcia photographed could only be found behind password and database protection, and viewed only by certain employees who were required to acknowledge the confidentiality of the information. *See* [69-29]; [69-30]; [69-31]; [66] at 53–56. Plaintiff likely took reasonable steps under the circumstances to protect the information. *See* 18 U.S.C. § 1839(3)(A).

---

[9] Garcia's citations to California decisions, *see* [74-1] at 18–19, aren't helpful because Medcor has also brought a claim under DTSA. *See* [81]. *IDX Sys. Corp. v. Epic Sys. Corp.*, 285 F.3d 581 (7th Cir. 2002) involved Wisconsin law, which isn't at issue here. In contrast to the facts of *B13, Inc. v. Hamor*, No. 08 CV 2384, 2011 WL 1231156 (N.D. Ill. Mar. 30, 2011) and *Lynchval Sys., Inc. v. Chicago Consult. Actuaries, Inc.*, No. 95 C 1490, 1998 WL 151814, *5 (N.D. Ill. Mar. 27, 1998), Medcor hasn't merely pointed toward general categories of information but has also identified types of protected information located in specific documents and presented evidence about the secrecy of those documents. *See* [69-1].

The contracts and proposals that Garcia photographed included contact information for key decisionmakers working for Medcor clients. *See, e.g.*, [69-17]; [69-18]; [69-22]. A Medcor executive testified that the company invested substantial resources in developing and maintaining relationships with its customers, and that the identities of key decisionmakers at Medcor clients had value because of the time it would take for another party to identify them. *See* [66] at 55.[10] Garcia argues that, given the power of search engines, it's easy to find the key decisionmakers for Medcor clients. *See* [74-1] at 22. But Medcor kept the identity of its client contacts secret using confidentiality agreements, and the fact that Garcia (having worked in the industry) could locate key industry decisionmakers with ease doesn't mean that the information was readily ascertainable. Plaintiff has shown some likelihood that its client contact information was a trade secret.[11]

Some of the documents that Garcia photographed included prices and fees for Medcor services. *See, e.g.*, [69-16] at 2; [69-19] at 7; [69-22] at 6; [69-24] at 6. Medcor's executive testified that the company's pricing methodologies varied depending on service needs and client levels, and were communicated to customers through

---

[10] The cases relied on by defendants agree that customer information developed with significant investments of time and resources is a trade secret. *See Cutera, Inc. v. Lutronic Aesthetics, Inc.,* 444 F.Supp.3d 1198, 1206 (N.D. Ill. 2020) (applying California law); *RKI, Inc. v. Grimes,* 177 F.Supp.2d 859, 873 (N.D. Ill. 2001) (applying Illinois law); *Chicagoland Aviation, LLC v. Todd,* No. 12cv1139, 2012 WL 5948960, at *5 (N.D. Ill. June 8, 2012) (applying Illinois law).

[11] Medcor's categorical allegation that Garcia misappropriated other "client information," [69-1] at 11, doesn't name any concrete secrets. *See Composite Marine Propellers, Inc. v. Van Der Woude,* 962 F.2d 1263, 1266 (7th Cir. 1992) (citation omitted). Plaintiff hasn't shown a likelihood that such information was a trade secret.

18

confidential proposals and contracts. *See* [66] at 53–55.[12] The record shows that a customer for COVID testing and screening services sought multiple bids for such services and shared pricing from competitors in an attempt to negotiate lower costs. *See* [74-13]. But that other providers allowed their pricing information to be shared doesn't indicate anything about whether Medcor kept its pricing information secret and derived value from that secrecy. *See Rockwell Graphic Sys., Inc. v. DEV Indus., Inc.*, 925 F.2d 174, 176–77 (7th Cir. 1991)) (a limited disclosure doesn't void trade secret protection). While a close call, Medcor has shown some likelihood that Medcor's pricing information was a trade secret because it conveyed that information to customers only in confidential documents and there was potential value (in the shape of a market advantage) in keeping Medcor's prices and methodologies secret. *See* 18 U.S.C. § 1839(3).

The contracts and proposals that Garcia photographed also contained Medcor business plans, including COVID screening procedures and workflows. *See, e.g.*, [69-19] at 3–4 (describing Medcor's COVID-19 screening procedure); [69-24] at 8–12 (describing Medcor's testing workflow); [69-25] at 3–6 (describing the roles of Medcor employees in an agreement for medical services). Garcia argues that the COVID

---

[12] That Medcor took steps to ensure the secrecy of its pricing distinguishes this case from those cited by defendants. *See Trailer Leasing Co. v. Assoc. Com. Corp.*, No. 96 C 2305, 1996 WL 450801, at *1 (N.D. Ill. Aug. 8, 1996) (pricing wasn't a trade secret where it was "unlikely that [price] information is ever secret"); *Carbonic Fire Extinguishers, Inc. v. Heath*, 190 Ill.App.3d 948, 953–54 (2d Dist. 1989) (pricing wasn't protectable where customers could share price information with a competitor); *Applied Indus. Materials Corp. v. Brantjes*, 891 F.Supp. 432, 438 (N.D. Ill. 1994) (same). *SBS Worldwide, Inc. v. Potts* doesn't disagree with the proposition that prices disclosed only through confidential documents are protectable. No. 13 C 6557, 2014 WL 499001, at *4 (N.D. Ill. Feb. 7, 2014).

protocols and related business plans weren't secret because Medcor was merely copying from publicly available public health guidance. *See* [74-1] at 22. But trade secrets don't have to be original works. They can exist "in a combination of characteristics and components, each of which, by itself, is in the public domain," but the "unique combination" of which "affords a competitive advantage and is a protectable secret." *3M v. Pribyl*, 259 F.3d 587, 595–96 (7th Cir. 2001) (citing *Syntex Opthalmics Inc. v. Tsuetaki*, 701 F.2d 677, 683 (7th Cir. 1983)).[13] Garcia is right that one of Medcor's questionnaires is similar to a CDC document. *Compare* [74-17] (Medcor's trusted entry questionnaire), *with* [74-18] (CDC's facilities COVID-19 screening). But Medcor has offered evidence that other screening procedures, workflows, and business plans included in the documents Garcia copied weren't widely known and has shown some likelihood that this information had value as a trade secret. *See* [66] at 36–39, 88–91.[14]

Garcia claims that he didn't misappropriate Medcor's secrets because he never used the information to solicit customers. *See* [74-1] at 23. But solicitation isn't the only way to misappropriate: a person also misappropriates when they acquire secrets

---

[13] Defendants also argue that the information Garcia knew about Medcor's business plans, screening protocols, and workflows was merely general knowledge or industry expertise. *See* [74-1] (citing *RKI, Inc. v. Grimes*, 177 F.Supp.2d 859, 873 (N.D. Ill. 2001)). But Medcor has shown that the information was kept secret and disclosed only to employees and customers, and wasn't known to the general public.

[14] Medcor alleges that Garcia took its marketing strategies, *see* [69-1] at 11, but it's not clear from the documents Garcia photographed that they included such information and Medcor hasn't identified concrete secrets related to its marketing materials. *See Composite Marine Propellers, Inc. v. Van Der Woude*, 962 F.2d 1263, 1266 (7th Cir. 1992). Medcor hasn't shown a likelihood of success that its marketing strategies were trade secrets.

by breaching a duty of secrecy. *See* 18 U.S.C. § 1839(6). In this case, Garcia's contract barred him from using the company's protected information after his termination, *see* [69-12] at 14, yet Garcia took photographs of Medcor contracts and proposals after he was fired in order to set up a competing company. *See* [74-3] at 116–17. Under DTSA, Medcor has shown some likelihood of actual misappropriation against Garcia and MedWay. *See* 18 U.S.C. § 1839(5).

The Defend Trade Secrets Act authorizes courts to enjoin threatened misappropriation, which applies when a plaintiff shows the inevitability of trade secret disclosure. *See* 18 U.S.C. § 1836(b)(3); *see PepsiCo, Inc. v. Redmond*, 54 F.3d 1262, 1267–68 (7th Cir. 1995) (applying a similarly worded state law); *Packaging Corp. of America, Inc. v. Croner*, 419 F.Supp.3d 1059, 1069 n.7 (N.D. Ill. 2020). To determine whether disclosure is inevitable, I consider (1) the level of competition between the former and new employer; (2) the similarity between the employee's former and new positions; and (3) the actions that the new employer has taken to prevent the use or disclosure of the former employer's trade secrets. *See Inventus Power, Inc. v. Shenzhen Ace Battery Co.*, Case No. 20-cv-3375, 2020 WL 3960451, at *11 (N.D. Ill. July 13, 2020) (citation omitted). Medcor must show intent or a high probability that Garcia will use trade secrets. *See PepsiCo*, 54 F.3d at 1269–70; *Saban v. Caremark Rx, L.L.C.*, 780 F.Supp.2d 700, 734 (N.D. Ill. 2011).

MedWay and Medcor offer COVID testing and screening services in a national marketplace, and have directly competed over several clients. *See* [66] at 23–24; [81] ¶ 2; [74-3] at 131–32. As Operations Manager, Garcia directed COVID testing and

screening services for Medcor, *see* [69-12]; [13-1] ¶ 18, and as the only employee of MedWay, *see* [74-3] at 227, occupies a similar position where Medcor's trade secrets could be used to provide client services or secure new clients. There's no suggestion that Garcia or MedWay have taken any steps to prevent the use or disclosure of Medcor's information. *See* [74-1] at 18–24. Beyond the similarity of Garcia's positions at Medcor and MedWay, there is also evidence that Garcia intended to use Medcor's information to set up his new business. *See* [74-3] at 116–17. Medcor has shown some likelihood that Garcia will inevitably disclose its trade secrets, and is likely to succeed on its DTSA claim against him and MedWay.

Medcor hasn't pointed to any particular information that Patel or Brown misappropriated, *see* [13] at 10–12; [69-1] at 11–13, and its general allegations about the kinds of information that defendants took don't adequately show misappropriation by these defendants. *See Life Spine*, 8 F.4th at 540. Perhaps Medcor is arguing that Brown misappropriated trade secrets by sending emails to Patel, and that Patel violated trade secret law by receiving that information and forwarding it to others. *See* [69-7]; [69-8]; [69-15]. But Medcor doesn't spell out these allegations, *see* [69-1], and it's not clear that the emails sent by Brown included trade secret information, that she wasn't authorized to send that information to Patel, or that Patel disclosed the information to anyone else. Medcor isn't likely to succeed on its trade secret claims against Brown and Patel.

### 4. *Tortious Interference with Contract*

To prove a claim of tortious interference, Medcor must show "(1) a valid contract, (2) defendant's knowledge of the contract, (3) defendant's intentional and

22

unjustified inducement of a breach of the contract, (4) a subsequent breach of contract caused by defendant's wrongful conduct, and (5) damages." *Webb v. Frawley*, 906 F.3d 569, 577 (7th Cir. 2018) (citing *Healy v. Metro. Pier & Exposition Auth.*, 804 F.3d 836, 842 (7th Cir. 2015)).

Medcor argues that Garcia knew of restrictive covenants in Brown's employment agreement and encouraged her to breach her contract by using protected information to solicit Medcor clients and divert business away from Medcor. *See* [13] at 8–9.[15] As discussed, Medcor has shown some likelihood that the restrictive covenants in Brown's contract were enforceable and that Brown breached her agreement's non-disclosure and non-compete clauses. Brown appears to have been promoted into Garcia's old job, *see* [69-10], and a message from Brown to Garcia indicates that Garcia at one time had a copy of Brown's contract. *See* [70-41] at 66.[16] Garcia asked Brown to tell a CBS executive about problems with Medcor's services in an attempt to end the CBS–Medcor relationship, and Brown did as Garcia requested. *See id.* at 58–59. Medcor has shown some likelihood of success on its tortious interference claim against Garcia.

---

[15] Medcor also argues that Garcia tortiously induced Patel to breach his agreements, *see* [13] at 9, but that allegation fails because Medcor hasn't shown that Patel breached any contract or that a valid contract existed between Medcor and Patel. *See Webb v. Frawley*, 906 F.3d 569, 577 (7th Cir. 2018).

[16] That Brown and Garcia were actively discussing Brown joining MedWay, *see* [70-41], also supports the proposition that Garcia knew the details of Brown's contract.

### 5.    *Unfair Competition and Trademark Infringement*

Medcor brings claims for federal and state-law unfair competition and trademark infringement against MedWay and Garcia. [81] at 53–60. To prevail on these claims, Medcor must show that its mark is protectable and that defendants' use of "MedWay" was likely to lead to confusion among consumers. *See AutoZone, Inc. v. Strick*, 543 F.3d 923, 929 (7th Cir. 2008) (citing *CAE, Inc. v. Clean Air Eng'g, Inc.*, 267 F.3d 660, 673–74 (7th Cir. 2001)). Medcor has registered two trademarks, *see* [13] at 13, and defendants don't dispute that the Medcor marks are protectable. *See* [46] at 14. The issue here is the likelihood of confusion in the market.

Whether a mark is likely to confuse turns on a seven-factor test: (1) the similarity between the marks in appearance and suggestion; (2) the similarity of the products; (3) the area and manner of concurrent use; (4) the degree and care likely to be exercised by consumers; (5) the strength of the plaintiff's mark; (6) any actual confusion; and (7) the intent of the defendant to "palm off" his product as that of another. *AutoZone*, 543 F.3d at 929 (citing *Packman v. Chicago Tribune Co.*, 267 F.3d 628, 642 (7th Cir. 2001)). No factor is dispositive, but the similarity of the marks, defendant's intent, and actual confusion are "particularly important." *Id.*

That Medcor and MedWay both begin with "Med" isn't enough to show similarity. *See Estate of P.D. Beckwith, Inc. v. Comm'r of Patents*, 252 U.S. 538, 545–46 (1920) (similarity should be evaluated based on the whole of the marks); *Sullivan v. CBS Corp.*, 385 F.3d 772, 777 (7th Cir. 2004) (similarity should be judged in light of marketplace realities). While MedWay and Medcor share a prefix, "med" is a

24

common term in the health care industry, and the words themselves are not so similar as to lead to consumer confusion.

Garcia's webinar appearance where he claimed credit for Medcor's experience and achievements is evidence that Garcia intended to palm off his new business as Medcor. *See* [70-5]; [74-3] at 224–231. Medcor and MedWay provide similar COVID testing and screening services in a national marketplace. *See* [66] at 23–24; [81] ¶ 2; [74-3] at 131–32. But Medcor hasn't offered any evidence about the strength of its marks. *See* [13] at 13. That a lab believed Garcia still worked for Medcor after he had been terminated doesn't indicate actual confusion in the market, either. *See* [13-1] at 17.[17] And given the severity of risks associated with COVID-19, it seems likely that consumers are careful in choosing a vendor, and would be unlikely to confuse the two businesses. *See CAE, Inc.*, 267 F.3d at 683 (consumers are likely to exercise care when selecting expensive services that aren't widely accessible). Medcor has some evidence to support Garcia's intent to confuse consumers, but plaintiff hasn't shown that it is likely to succeed on its unfair competition and trademark claims.

### 6. *Duty of Loyalty*

Agents owe duties of loyalty to their principals not to exploit their positions within a corporation for personal gain or hinder the corporation's ability to conduct business. *See Foodcomm Intern. v. Barry*, 328 F.3d 300, 303 (7th Cir. 2003) (citing

---

[17] At least two consumers of COVID testing and screening services knew the difference between MedWay and Medcor, but given that these consumers were familiar with Garcia before the formation of MedWay, this evidence of an absence of actual confusion in the market isn't persuasive. *See* [46-1] ¶ 24; [46-2] ¶ 18.

*E.J. McKernan Co. v. Gregory,* 252 Ill.App.3d 514 (2d Dist. 1993); *Veco Corp. v. Babcock,* 243 Ill.App.3d 153 (1st Dist. 1993)).

Medcor argues that Garcia breached his duty of loyalty because he didn't tell Medcor that he was forming a rival company after he was terminated but before signing an exit agreement. *See* [13-1] at 9–10. Medcor also alleges that Garcia used protected information to develop MedWay and solicited Medcor employees to join MedWay. *Id.* While it is likely that Garcia used Medcor's information to develop MedWay, Medcor hasn't shown that Garcia's duty of loyalty survived his termination, or, alternatively, that Garcia's allegedly breaching conduct occurred before he was fired. *See Prudential Ins. Co. of America v. Sempetrean*, 171 Ill.App.3d 810, 816 (1st Dist. 1988) ("As a general rule, the principles of good faith, loyalty and personal interest of an agent are not applicable following termination of an agency relationship.").

Brown was still employed by Medcor when she hindered Medcor's ability to do business with CBS by instructing CBS not to sign contracts with Medcor, *see* [70-41] at 58–76, and evidence also suggests that she tried to divert Medcor business to Garcia and MedWay. *See id.* at 58–76, 83; [69-7]; [69-15]. Brown likely owed a duty of loyalty to Medcor, *see Foodcomm Int'l*, 328 F.3d at 304 (citations omitted), and plaintiff is likely to succeed on its duty of loyalty claim against her.[18]

---

[18] Medcor didn't bring a duty of loyalty claim against Patel in either its original, *see* [1] at 57–58, or amended complaint, *see* [81] at 60–61, but did mention such a claim in its initial brief supporting the motion for a preliminary injunction. *See* [13] at 9–10. Because the claim isn't pending and Medcor hasn't shown why Patel owed a duty of loyalty to Medcor given his

### B.     Irreparable Harm

Medcor must show that it will suffer irreparable injury without a preliminary injunction. *See Life Spine, Inc. v. Aegis Spine, Inc.*, 8 F.4th 531, 545 (7th Cir. 2021) (quoting *Foodcomm Intern. v. Barry*, 328 F.3d 300, 304 (7th Cir. 2003)). Harm is irreparable if legal remedies are "seriously deficient as compared to the harm suffered." *Id*. Medcor alleges that its harms include (1) loss of opportunities to provide services to customers; (2) damage to relationships with existing and potential customers; (3) loss of revenue; (4) loss of Medcor's competitive edge in marketing; and (5) price erosion and loss of market share. *See* [69-1] at 10.

Medcor's alleged losses associated with price erosion and loss of market share aren't irreparable because those losses are usually calculable, *see Life Spine*, 8 F.4th at 546, and Medcor hasn't shown why they aren't in this case. Medcor wants to rely on a presumption of irreparable harm associated with trade secrets violations, *see* [69-1] at 10, but such harm is no longer presumed. *See Ebay Inc. v. MercExchange*, L.L.C., 547 U.S. 388, 393 (2006); *Flava Works, Inc. v. Gunter*, 689 F.3d 754, 755 (7th Cir. 2012).

Loss of customer relationships, loss of revenue, and harm to customer goodwill can all be irreparable injuries. *See Promatek Indus., Ltd. v. Equitrac Corp.*, 300 F.3d 808, 813 (7th Cir. 2002) (consumer goodwill); *Duct-O-Wire Co. v. U.S. Crane, Inc.*, 31 F.3d 506, 509–10 (7th Cir. 1994) (sales and opportunities to maintain and develop

---

contractual relationship with Onsite, *see* [69-13], no injunction against Patel is appropriate on a duty of loyalty theory.

customer relationships); *Stuller, Inc. v. Steak N Shake Enters., Inc.*, 695 F.3d 676, 680 (7th Cir. 2012). Whether lost customers and contracts can be cured by legal remedies depends on whether those losses can be identified. *See Life Spine*, 8 F.4th at 546.

Medcor lost the CBS Sports account but didn't lose Carr-Hughes or Shed as a result of defendants' conduct. While the evidence of customer loss is mixed, Medcor isn't required to make a "concrete demonstration" of its customer and contract losses, and "it is precisely the difficulty of pinning down what business has been or will be lost that makes an injury 'irreparable.'" *Hess Newmark Owens Wolf, Inc. v. Owens*, 415 F.3d 630, 632 (7th Cir. 2005) (citing *Hilton v. Braunskill*, 481 U.S. 770, 776 (1987)).[19] Because Medcor has shown some likelihood that its customer losses may be difficult to identify, its associated revenue losses are at least partly irreparable. *See Roland Mach. Co. v. Dresser Indus., Inc.*, 749 F.2d 380, 386 (7th Cir. 1984) (losses are irreparable where they are "very difficult" to calculate). More importantly, there is a risk that Garcia could use Medcor's trade secrets to cause further losses to plaintiff. Medcor has shown irreparable injury through lost customers, potential customers, and revenue.

Medcor has also shown that defendants damaged its reputation and customer goodwill. Messages between Garcia and Brown indicate that they were interfering

---

[19] Medcor has shown some likelihood that its customer losses were caused by defendants' conduct. *See Abrasic 90 Inc. v. Weldcote Metals, Inc.*, 364 F.Supp.3d 888, 903 (N.D. Ill. 2019); *Mullis v. Arco Petroleum Corp.*, 502 F.2d 290, 293 (7th Cir. 1974). *Chicagoland Aviation, LLC v. Todd* is distinguishable because the plaintiff in that case admitted that his customer losses could be quantified. No. 12cv1139, 2012 WL 5948960, at *6 (N.D. Ill. June 8, 2012).

with the Medcor-CBS relationship, and it seems likely that their actions caused harm to Medcor's reputation with key executives at CBS. *See* [70-41]. Garcia misappropriated Medcor's trade secrets to help build his business, and could further damage Medcor's relationships with current and prospective customers through the use of that confidential information. Medcor's reputational harms are irreparable because they are difficult to measure in monetary terms, *see Stuller, Inc.*, 695 F.3d at 680, and plaintiff's harms associated with the use of its trade secrets can't easily be remedied by damages because they are difficult to prove and quantify. *See Turnell v. CentiMark Corp.*, 796 F.3d 656, 666 (7th Cir. 2015).

### C. Balance of Equities and Public Interest

The injunction Medcor wants would restrain defendants from violating their agreements with Medcor; prevent them from conducting business with clients whom they solicited or communicated with in breach of their agreements; prevent them from using Medcor's proprietary information; require defendants to return Medcor's protected information; require them to stop using the MedWay mark; and require them to preserve all documents relevant to the case. *See* [12].

Medcor has made a strong showing on the merits for its breach of contract claim against Garcia, and has met its burden as to the tortious interference and trade secret claims against him and the contract and duty of loyalty claims against Brown.[20] Plaintiff's showing of irreparable harm is less persuasive. There's evidence

---

[20] Medcor hasn't shown that it is likely to succeed on any of its claims against Patel, and isn't entitled to an injunction against him. There's no evidence to suggest that Brown is causing continued harm to Medcor, and so there is no reason to alter the status quo by issuing an

that defendants didn't cause any non-quantifiable loss of business to the company (since CBS Sports is an identifiable loss), and it seems likely that most of Medcor's alleged losses can be remedied through damages. *See e360 Insight, Inc. v. Spamhaus Project*, 658 F.3d 637, 648 n.8 (7th Cir. 2011) (lost profits don't need to be proven with precision). Given a limited customer pool for COVID testing and screening services and the fact that Medcor could estimate customer needs and price tolerances, revenue and customer losses aren't as irreparable in this case as in others, and caution is warranted based on the sliding scale of harms. But plaintiff has shown some irreparable harm: Medcor may have lost customers and associated revenue that can't be identified, and without an injunction there is a likelihood that it will suffer additional losses of customers and damage to its reputation through Garcia's and MedWay's use of its trade secrets.

Garcia argues that granting the injunction will necessarily force MedWay to permanently fold and result in personal financial losses, *see* [74-1] at 26, but an injunction centered on Medcor's trade secrets won't necessarily do that. Any harm to Garcia caused by requiring him to honor his obligations to avoid using Medcor's information will be minimal, and would derive entirely from his breach of contract and misappropriation of trade secrets. The harm to Garcia and MedWay is self-inflicted, and the public interest favors the enforcement of contracts and the

---

injunction against her, either. Because Medcor isn't likely to succeed on its unfair competition and trademark infringement claims, requiring defendants to cease using the MedWay mark isn't appropriate.

protection of trade secrets. The balance favors an injunction against MedWay and Garcia.

Enjoining Garcia and MedWay from conducting business with Medcor clients obtained in violation of Garcia's contract alters the status quo, is not necessary to remedy the immediate threat of harm posed by Garcia's and MedWay's potential use of trade secrets, and would go beyond the parties' restrictive covenant.[21] Garcia agreed not to compete with Medcor for six months after the end of his employment at Medcor, the contract does not provide for the extension of that non-compete period in the event of a breach; the parties bargained for Garcia's noncompetition from December to May 2021. *See* [69-12] at 17–18; *Citadel Inv. Grp., LLC v. Teza Techs. LLC*, 398 Ill.App.3d 724, 736 (3d Dist. 2010) (citing *Stenstrom Petroleum Serv. Grp., Inc. v. Mesch*, 375 Ill.App.3d 1077 (2d Dist. 2007)). Medcor is free to compete for Shed Media, and so plaintiff's harm without an order disrupting defendants' ongoing business with Shed is minimal. Requiring MedWay to stop doing business with Shed would likely cause substantial harm to MedWay and Garcia. *See* [74-3] at 140–41 (Shed Media is MedWay's largest client). The potential harm to Shed—which would be forced to seek COVID testing and screening services elsewhere at a moment when they are particularly important—also weighs against this form of relief.[22]

---

[21] An injunction forcing Garcia and MedWay to stop working with its existing clients would be a mandatory injunction—one requiring an affirmative act—and such injunctions are cautiously viewed and sparingly issued. *See Mays v. Dart*, 974 F.3d 810, 818 (7th Cir. 2020) (citations omitted).

[22] Requiring MedWay and Garcia to preserve documents relevant to the case duplicates existing discovery obligations, *see* Fed. R. Civ. P. 26, and given Rule 37, the extraordinary remedy of a preliminary injunction is not necessary to ensure compliance.

Rule 65(c) requires the movant give security in an amount that the court considers proper to pay the costs and damages sustained by any party found to have been wrongfully enjoined. If wrongfully enjoined, Garcia and MedWay will have incurred costs in identifying and returning Medcor's trade secrets, and may lose out on some customers for events in the coming months. Security is appropriate, and Medcor shall post $5,000 with the Clerk of Court to secure this injunction.[23]

## IV.    Conclusion

Plaintiff's motion for a temporary restraining order and preliminary injunction, [12], is granted in part, denied in part.

ENTER:

_____
Manish S. Shah
United States District Judge

Date:    January 13, 2022

---

[23] The cost of a wrongful injunction here is minimal because the injunction merely orders Garcia and MedWay to not use or possess information they are not entitled to have. There may be some cost incurred in complying and that value is sufficient to secure the injunction.

32